## TARVER v. VALLANCE.

### No. 4645.

Court of Civil Appeals of Texas. Amarillo.

Oct. 19, 1936.

Hamilton & Fitzgerald, of Memphis, and Carrigan, Hoffman & Carrigan, of Wichita Falls, for appellant.

A. S. Moss and John Otho Fitzjarrald, both of Memphis, for appellee.

HALL, Chief Justice.

This suit was instituted by Mrs. Elsie Vallance, joined by her husband, Otho Vallance, against W. B. Quigley, to recover damages alleged to have resulted to Mrs. Vallance from a collision between a car occupied by Mrs. Vallance and others and a car driven by W. B. Quigley. Prior to the final trial Quigley died, and his administrator, Tarver, was substituted as a party defendant.

There was a trial to a jury upon special issues, resulting in a verdict and judgment of $9,000 in favor of the plaintiffs.

Neither party has favored us with a satisfactory statement of the nature and result of the suit. It appears that the collision occurred on State Highway No. 5 where said highway, by means of a viaduct, passes over a branch of the Fort Worth & Denver City Railway Company, about a mile and one-half north of the town of Estelline. It appears that Vallance and his wife were in a car owned and driven by Mrs. Mattie L. Stanford, the mother of Mrs. Vallance, who resided in Memphis but had been to Estelline for some medicine, and at the time of the collision was returning to Memphis. That Quigley was going from Memphis to Estelline. The viaduct consisted of a concrete bridge with banisters, and extended across the railroad track, the concrete work

being some fifty to seventy-five feet in length, and from eighteen to twenty feet wide. This viaduct was reached by approaches built of dirt leading from the road level gradually up to each end of the concrete part of the viaduct. The collision occurred about fifty feet from the north end of the concrete part of the viaduct. It was conceded that Vallance and wife were guests accompanying Mrs. Stanford from Memphis to Estelline and return, and that the accident happened about 8:30 o'clock at night.

The defendant answered, alleging that the car in which plaintiffs were riding was moving at a high rate of speed, over forty-five miles per hour; that plaintiff failed to keep to her right; that her car had very bright lights, and it ran into the concrete banister of the viaduct and the wire banister of the road leading up to the viaduct, which threw her car across the road to her left and "sideswiped" Quigley's car, and by the impact it was thrown back on her side of the road. The other facts alleged will be stated in disposing of the numerous propositions advanced.

As stated, the defendant's pleading alleged that Mrs. Stanford was guilty of contributory negligence in running so close to the concrete banister, and the wire guard which connected with it, as to cause her car to swerve to her left and to cross the center of the road. The court instructed the jury as follows: "By the term 'contributory negligence', as used in this charge, is meant such an act or omission, if any, on the part of plaintiff amounting to a want of ordinary care and prudence of the plaintiff, and which co-operated or concurred with some negligent act or omission, if any, on the part of the defendant, and which act of contributory negligence was the direct and proximate cause or occasion of the injury complained of."

The defendant objected because the definition imposed a greater burden upon the defendant than the law permitted, placing upon the defendant the duty to show that the negligence of the plaintiff was the direct and proximate cause of the injury when under the law contributory negligence exists if the negligence of the plaintiff concurs with the negligence of the defendant, and the two together proximately cause the injury complained of. In this connection the court submitted the special issue: "Did such failure on the part of Mattie L. Stanford to drive her car on the right hand side of the center of the highway at the time of the alleged collision constitute negligence, if any, as that term is hereinbefore defined in paragraph 4 of this charge?"

The court submitted the further special issue in the alternative: "Did such negligence, if any, directly and proximately cause and contribute to the injury, if any, that the plaintiff, Elsie Vallance, sustained to her person?"

The jury failed to answer these two issues.

We think the definition as given was not in a measure artfully drawn, though there is some uncertainty in the light of the decisions and text-writers. 30 Tex. Jur. pp. 758–760, §§ 92, 93; Id., pp. 773–775, §§ 103, 104; 102 A.L.R. 425; Commercial Standard Ins. Co. v. Shudde (Tex. Civ.App.) 76 S.W.(2d) 561, 565 (11).

The further objection is made that in defining "proximate cause" the court failed to include a definition of "new and independent cause," for the reason that the defendant pleaded that the driver of the car in which the plaintiffs were riding lost control of the same before the accident occurred as the result of driving said car into the concrete banister alongside the viaduct and into the woven wire banister which extended on the outer edge of the viaduct proper in a northerly direction, and as a result of this new and independent cause, the car in which plaintiffs were riding ran into the path of the Quigley car and the accident occurred, and the pleadings and proof supported the contention.

In defining "proximate cause" the court omitted the element of "new and independent cause." Plaintiff pleaded that Mr. and Mrs. Vallance were passengers and guests in the car owned and driven by Mrs. Stanford; that they were proceeding toward Memphis on Highway No. 5; that Quigley (now deceased) was driving his automobile toward Estelline over the same highway; that the two cars met near the viaduct which passes over the railroad tracks of the Fort Worth & Denver-South Plains Railway, about a mile northwest of the town of Estelline. There is an allegation to the effect that Quigley was driving his car from one side of the road to the other, and traveling at a speed estimated at from fifty to sixty miles per hour; that Quigley drove his

car to his left and into the principal part, if not all, of the plaintiff's side of the road, driving into the car in which the plaintiffs were riding.

The defendant pleaded that none of the acts of negligence charged to Quigley were true, but, on the contrary, he was driving at a reasonable rate of speed within the limits provided by law, and on his right-hand side of the highway; that as he approached the viaduct the car in which plaintiffs were riding was on its wrong side of the road; that it was equipped with powerful, bright headlights which blinded the said Quigley, and which, as soon as he observed, he immediately pulled as far as he could to his right of the highway in order to protect himself and his guest; that the car in which plaintiffs were riding was driven over said highway in excess of forty miles per hour, in violation of the speed laws; that the car in which plaintiffs were riding drove into and collided with the concrete banister which was a part of and along the side of the viaduct; that after striking the banister the driver became excited and lost control of her car and drove into the wire fence guard or banister along her side of the highway which extended north from the concrete banister; that said car knocked down a portion of said wire fence and the posts supporting the same over a distance of fifty or sixty feet, and that when the car struck said fence it was thrown by the impact across the paved portion of the highway and "sideswiped" the car of the said Quigley; that such acts of the driver of plaintiff's car in running into the concrete banister and wire fence, in failing to keep and maintain control of said car, and in failing to bring the same to a stop when the car struck said banister and fence, constituted the proximate cause of the collision.

Mrs. Stanford testified that the headlights of her car were in good condition, and she could see exactly where she was on the highway, and where the Quigley car was; that after the collision the Stanford car was some six or seven, and maybe eight, posts north of the end of the concrete banisters of the viaduct; that as she drove across the concrete portion of the viaduct her car scraped the concrete banister and tore the wire off five posts of the wire guard; that she tore the wire down, but was still coming over further; that she knocked two posts of the wire banister to the ground, and one nearly down; that she never brought her car to a stop until the collision occurred. The posts were about eight inches in diameter, and were set about ten feet apart.

Quigley's testimony, as taken by the stenographer on the first trial, was read in part, in which he said he was within two hundred or two hundred and fifty feet of the viaduct when he first noticed the Stanford car coming; that its lights were very bright; that he was driving leisurely along and pulled to the right of the pavement on his right side; that when he pulled to the right the Stanford car appeared to him to be in the middle of the road, and that was when he moved to the right, and the accident happened some forty or forty-five feet north of the north end of the viaduct; that the collision was what he would call a "sideswipe"; that the left front wheel of his car and the left front wheel of the Stanford car were both damaged; that as soon as he saw the Stanford car coming he pulled over on his right side of the road, and the first thing he knew there was a crash and his car swerved to the left; that when the Stanford car stopped it was standing at an angle across the highway; that when the collision occurred he was on his side of the pavement.

Witness Allen testified that he and Vernon Neeley came upon the scene immediately after the accident and noticed the wrecked cars, and he and Neeley got into an argument about the wreck so they got out and inspected the cars to settle the dispute between themselves; that he noticed a mark on the pavement as made by burned rubber, and followed it up to the Quigley car; that the marking on the pavement was on the right-hand side coming toward Estelline.

Neeley said that he noticed a tire mark on the pavement which looked as if the tire had skidded where it blew out, and had skidded several feet; that the mark was about eight feet from the guard rail, which would be more on the right of the center of the road going towards Estelline; that the mark followed down to where the Quigley car had stopped.

Otho Vallance testified that he was on the back seat of the Stanford car at the time of the accident; that as Mrs. Stanford drove across the concrete portion of the viaduct she rubbed the concrete banister as she came across, and that she was about halfway up on the concrete portion

of the viaduct when she rubbed the concrete banister; that the collision occurred about seven posts from the concrete part of the viaduct; that she knocked three posts down, and knocked the wire off of two; that the posts knocked down were nearest the concrete banister, and that when she ran into the wire banister she knocked off the back fender of the car, and that was before the collision; that Mrs. Stanford's car knocked down two posts before the collision happened; that it jarred the Stanford car when it hit the wire netting and the posts; and that it never stopped until the collision occurred.

The defendant requested the court to submit issues inquiring: (1) Whether the Stanford car was being driven in excess of forty-five miles an hour, and, if so, if it was the sole proximate cause of the accident; (2) whether the driving of the Stanford car against the concrete banister of the viaduct resulted in loss of control of the car, and, if so, was such loss of control the sole proximate cause of the collision; (3) whether the driving of the Stanford car against the wire netting fence resulted in the loss of its control by its driver, and, if so, was the loss of control of the car the sole proximate cause of the collision; (4) whether the driving of the Stanford car into the wire banister was negligence, and, if so, was it the proximate cause of the collision, and the sole proximate cause; (5) was the driving of the Stanford car into the concrete banister negligence, and, if so, was it the proximate cause of the collision, and the sole proximate cause of the collision; (6) whether the Stanford car was driven on the wrong side of the paved portion of the highway, and, if so, was such driving negligence, and, if negligence, was it the sole cause of the collision. The court refused to give any of these issues.

■ The term "new and independent cause" is said to be that cause which interrupts the natural sequence of events, turns aside their course, prevents the natural and probable result of the original act or omission, and produces a different result which could not have been reasonably foreseen by a person of ordinary prudence. We believe the pleading was sufficient to present the issue of new and independent cause. It states the particular facts which constitute a new and independent cause, without stating the conclusion to be drawn from the facts.

■ This court said in Hickernell v. Gregory et ux., 224 S.W. 691, 694: "The rule is that, though fraud is neither alleged eo nomine nor set out by the pleader as a legal conclusion from the facts stated, yet, when the pleading sets up facts which, if true, amount to fraud, it is sufficient even without alleging a fraudulent intent."

What is said with reference to alleging fraud is true when characterizing the conduct and actions of the other party, with the possible exception of a charge of negligence or contributory negligence. Sovereign Camp, W. O. W., v. Ray (Tex.Civ. App.) 262 S.W. 819; Kreis v. Kreis (Tex. Civ.App.) 57 S.W.(2d) 1107; Wright v. McKenney, 34 Tex. 568; Parker v. Allen, 33 Tex.Civ.App. 206, 76 S.W. 74.

■ We think it is clear that the testimony stated in substance above was sufficient to have required the court to submit the issue, or rather to have required the court to have included it in the definition of "proximate cause."

The Supreme Court said in Southland Greyhound Lines, Inc. v. Cotten, 91 S.W. (2d) 326, 328: "It is reversible error, in a cause in which the testimony tends to prove the injury resulted from a new and independent cause, not to submit a definition of 'proximate cause' embodying that term, or a similar term, together with a definition of same." Citing numerous authorities.

The defendant pleaded that the car in which plaintiffs were riding, and which was being driven by Mrs. Stanford, was running in excess of forty-five miles an hour; that the driver failed to keep a lookout; that she drove the car knowing it was equipped with glaring headlights; that she failed to yield the right of way to the defendant; that she drove the car across the center of the highway and on the wrong side thereof, and drove it into and collided with a concrete banister which was a part of the viaduct; that after striking the banister she became excited and drove into and collided with the woven wire fence erected along the side of the highway and knocked down a portion of said fence and several posts supporting the same over a distance of fifty or sixty feet, and that when she struck the fence the car was thrown across the pavement and "sideswiped" the car of the defendant, and that each and all of the foregoing acts constituted the sole cause of the collision.

The testimony of several witnesses was that there was a mark on the pavement which circled in toward the Quigley car, and that when witnesses first noticed the mark it was about the center, or a little closer to the east side, of the road. Another witness testified that when he first saw the mark it made a sort of circle and went in the direction of Quigley's car, and was about the center, or somewhere near the center, of the road, or maybe a little further to the east. Other facts were testified to by the witnesses which tended to establish the defendant's contention that when Mrs. Stanford's car struck the concrete banister and the woven wire fence, it caused her to become excited and lose control of the car. Both cars were traveling rapidly, and the jury might have decided that the location of the cars when third parties arrived on the scene was no indication of where the two cars collided.

■ The defendant requested the court to give several charges, inquiring whether the Stanford car was driven against the fence prior to the collision, and whether the driver then lost control; whether such loss of control was the proximate cause of the collision; whether Quigley was blinded by the lights of the car; whether the Stanford car was driven against the concrete banister and the woven wire fence; whether these acts constituted negligence; and whether such negligence constituted the proximate cause of the collision.

We think the pleadings and the evidence raised these issues.

■ It is the established law that each party is entitled to have every material issue of fact raised by the pleadings and the evidence submitted to the jury. Fox et al. v. Dallas Hotel Co., 111 Tex. 461, 240 S.W. 517; Dallas Hotel Co. v. Fox (Tex. Civ.App.) 196 S.W. 647; St. Louis S. F. & T. Ry. Co. v. Wilson (Tex.Com.App.) 279 S.W. 808; Rogers v. Cotton (Tex.Civ. App.) 42 S.W.(2d) 173; Dallas Railway & Terminal Co. v. Garrison (Tex.Com. App.) 45 S.W.(2d) 183.

■ Appellant complains of the failure of the court to submit the issue of unavoidable accident. In our opinion that question is not in the case. "Unavoidable accident" is defined as being: "One which is not occasioned in any degree either directly or remotely by want of such care or prudence as law holds every man bound to exercise, and, if accident complained of could have been prevented by either party by use of means suggested by common prudence, it was not unavoidable." Dallas Railway & Terminal Co. v. Darden (Tex. Com.App.) 38 S.W.(2d) 777.

It is briefly, but correctly, defined in Texas & P. Ry. Co. v. Edwards (Tex. Com.App.) 36 S.W.(2d) 477, as an accident "which occurs without the fault of either party." See, also, Ft. Worth & R. G. Ry. Co. v. Sageser (Tex.Civ.App.) 18 S.W. (2d) 246; 41 Tex.Jur. pp. 1013–1018.

■ There was testimony to the effect that plaintiff's (Mrs. Vallance) mind was greatly affected by the injury, and that she had sustained a fractured skull which resulted in the practical loss of her hearing, and since the accident she was continuously in a comatose state. With the view of ascertaining the extent of her injuries, she consulted a specialist who was shown to be an expert in diseases of the eye, ear, nose, and throat. She went to his office for examination, which he commenced but did not finish, as she stated she did not have time to complete the examination, but promised to return the next day for further examination. She did not return. The specialist would have testified that she admitted hearing the ordinary spoken voice with the left ear at a distance of five inches, that there were no scars on the ear drum, that there was a slight retraction of both ear drums, that she did not co-operate with him in a further examination with tuning forks and other apparatus to enable him to determine her true condition, and that he could not state with reasonable certainty that she had any injury to her ears. The court excluded all of this testimony upon the objection of plaintiff's counsel.

One of the principal issues in the case was whether she had actually sustained any injury. Another was the nature of the injury, if any, and a third was the extent of such injury. We think this was error. As said in 17 Tex.Jur. 310, § 89: "The refusal of the plaintiff in a personal injury action to submit to a physical examination by disinterested physicians is a circumstance tending to discredit his claim as to the extent of his injuries, and is admissible in evidence for that purpose. * * * There may be reasons for such a refusal which will greatly weaken, if not wholly destroy, its effect as evidence, but the refusal and the reason, if any, given therefor by the plaintiff are facts

to go to the jury, and must be weighed by them, and the existence of such reasons is no excuse for excluding the evidence from the jury."

Also, in 24 Tex.Jur. 441, § 4, it is said: "Notwithstanding the fact that the plaintiff in a personal injury action may refuse to submit to a physical examination, the refusal to submit to an examination by disinterested physicians may be brought before the jury to be considered by them in determining the creditability and sufficiency of the testimony upon which the plaintiff seeks to recover."

These texts are supported by numerous authorities. The court erred in excluding the testimony.

Because of the errors pointed out, the judgment is reversed and the cause remanded.